Filed 11/17/14  P. v. Duran CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B249683 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BA401478) |
| GILBERT R. DURAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, George G. Lomeli, Judge.  Affirmed.

Daniel G. Koryn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephen D. Matthews, and Timothy M. Weiner, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Gilbert R. Duran appeals from the judgment entered after a jury convicted him of kidnapping, forcible oral copulation, corporal injury to a former cohabitant, making a criminal threat and assault by means likely to produce great bodily injury. Duran contends the court committed prejudicial error in failing to instruct the jury sua sponte with a mistake-of-fact defense and several lesser included offenses, the prosecutor committed misconduct during closing argument and the court imposed an unauthorized restitution fine. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Amended Information*

An amended information filed February 1, 2013 charged Duran with kidnapping (Pen. Code, § 207, subd. (a))[1] (count 1) forcible oral copulation (§ 288a, subd. (c)(2)(A)) (count 2), corporal injury to a cohabitant (§ 273.5, subd. (a)) (count 3), attempt to make criminal threats (§§ 644; 422, subd. (a)) (count 4)[2] and assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)) (count 5). It was specially alleged as to counts 1, 2, 4 and 5 that Duran had suffered three prior convictions for felonies and had served three prior separate prison terms within the meaning of section 667.5, subdivision (b). In addition, it was specially alleged as to those counts that Duran had suffered one prior serious or violent felony conviction within the meaning of both the three strikes law (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)) and section 667, subdivision (a). Duran pleaded not guilty and denied the special allegations.

2. *The Trial*

The evidence at trial was directed to incidents on two dates: December 2, 2011 (counts 1, 2) and August 15, 2012 (counts 3-5). On December 2, 2011 Ramona T. was parking her car after returning home late at night from work when Duran, her then live-in boyfriend, forced his way into her car, screaming and accusing her of seeing other men. He told her to drive to a dark alleyway near their home. Initially she refused. He ordered

---

[1]     Statutory references are to the Penal Code.

[2]     As discussed below, count 4 was later amended during trial to charge Duran with the completed crime of making a criminal threat.

2

her to "turn on the fucking car right now." Scared of Duran's aggressive demeanor and wanting to protect her 15-year-old son who was in the home from Duran's erratic behavior, she complied. When they got to the alleyway and Ramona stopped the car, Duran forced her to perform oral sex on him, telling her, "Bitch, you need to suck my dick like you do—all these motherfuckers that you're with." Ramona said no and tried to resist but he forced his penis into her mouth and pulled her hair to make her comply. After several minutes, Ramona managed to pull away from him. He insisted she drive on the freeway and took the steering wheel in an attempt to make her comply with his order, but she turned the steering wheel the other direction. At her first opportunity she ran from the car to a nearby gas station and asked for help. He followed her inside the station's convenience store. A recorded call from one of the gas station patrons to the emergency operator was played for the jury in which Ramona is heard telling the emergency operator Duran had just sexually assaulted her.

On August 15, 2012 Duran, who had since moved out of the home, had come to Ramona's house to retrieve some of his clothes and possessions. Duran had just been fired from his job that morning and wanted to speak with Ramona. Ramona thought Duran was behaving aggressively and told him she did not want to talk to him. Just as Ramona walked with Duran to the front door so he could leave, Duran grabbed her from behind and began choking her and dragging her to the living room couch. He told her, "I'm going to fucking hurt you, you fucking bitch." When she reported the attack to law enforcement, Ramona said Duran had also threatened to kill her. On direct examination at trial, however, Ramona initially denied Duran had threatened her life during the attack. Later, on redirect, she admitted Duran had threatened to kill her as he was choking her. She explained her inconsistent testimony on this point by stating she was reluctant to accuse him. She was afraid of Duran—he was associated with a criminal street gang— and she once loved him and felt sorry for him.

Ramona's son, Julian, also testified. On the night of the August 15, 2012 attack, he heard his mother struggling with Duran and ran out of his bedroom to protect her. He heard Duran tell his mother, "I'm going to kill you, bitch." Julian jumped on Duran's

3

back, shouting at him to stop hurting his mother. Duran pushed Julian off of him. Duran initially started to advance toward Julian, taunting him; then he stopped and walked outside alone. A neighbor, Isabel Avilá, testified she ran outside and heard Duran scream at Ramona, "I'll fucking kill you bitch" when both Duran and Ramona were outside. Avilá called the police. Ramona suffered bruising to her neck from the attack.

Immediately after Julian and Ramona testified, the prosecutor requested count 4 of the information (attempt to make a criminal threat) be amended to charge the completed crime of making a criminal threat. The court granted the request and ordered the information amended according to proof.

Duran testified in his own defense. He denied sexually assaulting Ramona. According to Duran, on December 2, 2011 he and Ramona had mutually decided to go to the store to get supplies for home. They drove together to a nearby gas station and convenience store. They argued in the car; and after Duran went inside the station's store to get the supplies, she followed him and continued shouting at him. Duran emphatically denied engaging in any sexual activity with Ramona on December 2, 2011 or even touching Ramona while they were in the car together. He did not know Ramona had accused him of sexual assault until several months later when formal charges were brought against him.

Duran admitted he and Ramona had an altercation on August 15, 2012, but it had been misinterpreted by Ramona, Julian and Avilá. He explained, when he arrived at the house that day, Ramona had been "in one of her moods." They started arguing and at one point, he grabbed her shoulder to turn her around so she could face him. Julian saw him grab Ramona and, misunderstanding Duran's intent, jumped on Duran's back. Duran gently nudged Julian off of him and then went outside. Duran denied taunting Julian or choking or threatening Ramona. He acknowledged writing letters of apology to Julian and Ramona after the August 2012 altercation.

3. *The Verdict and Sentence*

The jury convicted Duran on all counts. In a bifurcated court trial the court found each of the prior conviction allegations true. The court sentenced Duran to an aggregate state prison term of 19 years.[3]

**DISCUSSION**

1. *The Trial Court Did Not Have a Duty To Give Sua Sponte Any of the Instructions Duran Identifies in his Appellate Brief*

A trial court in a criminal case has a duty to instruct on general principles of law applicable to the case (*People v. Moon* (2005) 37 Cal.4th 1, 37), that is, "'""those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.'"""" (*People v. Valdez* (2004) 32 Cal.4th 73, 115.) This obligation includes the duty to instruct sua sponte on any lesser included offenses if the evidence raises a question as to whether the elements of the lesser included offense, but not the greater offense, are present. (*Ibid.*; *People v. Breverman* (1998) 19 Cal.4th 142, 154.) The existence of "'""any evidence, no matter how weak"'""" will not justify instructions on a lesser included offense; such instructions are required only when the evidence is sufficiently substantial that a reasonable jury could conclude the lesser offense, but not the greater, was committed. (*People v. Banks* (2014) 59 Cal.4th 1113; 1161; *People v. Avila* (2009) 46 Cal.4th 680, 705; see *People v. Gutierrez* (2009) 45 Cal.4th 789, 826 [a trial court need not instruct the jury on a lesser

---

[3]     Duran's sentence was calculated as follows:  10 years for count 1 (the middle term of five years, doubled under the three strikes law), plus five years pursuant to section 667, subdivision (a), plus a consecutive four year term for count 2 (one-third the middle term of six years, doubled under the three strikes law). The court imposed a term of six years for count 3 (the middle term of three years doubled under the three strikes law), eight years for count 4 (the middle term of 4 years, doubled under the three strikes law) and six years for count 5 (the middle term of 3 years, doubled under the three strikes law), with the sentences imposed on counts 3 and 4, to run concurrently with each other and with the sentence imposed on counts 1 and 2. The sentence on count 5 was stayed pursuant to section 654.

5

included offense when "no evidence supports a finding that the offense was anything less than the crime charged"].)[4]

A defendant's reasonable and good faith mistake of fact regarding the victim's consent to sexual activity is a defense to sexual assault. (See *People v. Mayberry* (1975) 15 Cal.3d 143, 154-155 [a reasonable mistake of fact regarding consent is incompatible with the existence of wrongful intent].) In any sexual assault case in which there is substantial evidence of the victim's equivocal conduct that could have led a defendant to reasonably and in good faith believe the victim consented to the sexual act, the court must instruct the jury, even absent a request, with a mistake-of-fact instruction akin to the one found in CALCRIM No. 1015 or CALJIC No. 10.65, commonly known as a *Mayberry* instruction.[5] (*People v. Maury* (2003) 30 Cal.4th 342, 424; *People v. Williams* (1992) 4 Cal.4th 354, 362; see *Mayberry,* at pp. 154-155; Use Note to CALJIC No. 10.65 (2014 rev.) [*Mayberry* instruction must be given sua sponte when justified by evidence].)

The issue whether the evidence warranted a particular instruction is reviewed de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1218; *People v. Waidla* (2000) 22 Cal.4th 690, 733 [same].)

---

[4] The Attorney General's repeated assertions that Duran has forfeited his arguments because he failed to request each of the lesser-included-offense instructions at trial is simply wrong. The forfeiture doctrine does not apply to Duran's argument the court had a duty to give the instructions sua sponte based on the evidence presented. (See *People v. McCurdy* (2014) 59 Cal.4th 1063, 1075, fn. 3 [argument that court failed to instruct sua sponte on general principle of law relevant to issues raised by evidence does not require action on part of defendant at trial in order to preserve argument for appeal]; *People v. Alvarez* (1996) 14 Cal.4th 155, 220 [same]; see generally *People v. Breverman, supra,* 19 Cal.4th at p. 154 [instruction on lesser included offense required, even absent a request, when there is sufficient evidence to support it].)

[5] CALCRIM No. 1015 provides in part, "The defendant is not guilty of forcible oral copulation if he or she actually and reasonably believed that the other person consented to the act."

CALJIC No. 10.65 provides in part, "There is no criminal intent if the defendant had a reasonable and good faith belief that the other person voluntarily consented to engage in [sexual intercourse] [oral copulation] [sodomy] [or] [penetration of the [genital][anal] opening by a foreign object, substance, instrument or device]."

a. *There was no substantial evidence to support a <u>Mayberry</u> instruction on mistake of fact as to the victim's consent*

Here, Duran did not rely on a mistake-of-fact defense; in fact, he denied oral sex had occurred. Ramona, on the other hand, testified Duran forcibly overcame her resistance and thrust his penis into her mouth against her will. Their "wholly divergent accounts create[d] no middle ground from which [Duran] could argue he reasonably misinterpreted [Ramona's] conduct." (*People v. Williams, supra,* 4 Cal.4th at p. 362.) Nothing in this record justified a sua sponte *Mayberry* instruction. (See *People v. Maury, supra,* 30 Cal.4th at p. 424 [no sua sponte obligation to give *Mayberry* instruction when defendant did not rely on mistake-of-fact defense regarding victim's consent and there was no evidence of the victim's equivocal conduct to support it]; see also *People v. Martinez* (2010) 47 Cal.4th 911, 954 [when defendant claimed he had no contact with victim at all other than observing her being chased by someone else, there was no substantial evidence of equivocal conduct or mistaken belief in her consent to warrant *Mayberry* instruction]; *Williams*, at p. 362 [when victim testified defendant physically assaulted her, forced her on the bed and ordered her to remove her clothes or he would hurt her and defendant testified victim had initiated the sexual act, no *Mayberry* instruction was required; jury either believed victim initiated and consented to sexual intercourse, or defendant forcibly overcame victim's will—there was no evidence of any "middle ground"]; see also Com. to CALJIC No. 10.65 (2014 rev.) [court is not required to give *Mayberry* instruction sua sponte where "defendant does not claim good faith belief victim consented and there is no evidence to support such a defense"].)

b. *There was no substantial evidence to support an assault and/or battery instruction*

Duran contends the court had a duty to instruct sua sponte on assault and/or battery as lesser included offenses of forcible oral copulation. Assuming assault and battery are, in fact, lesser included offenses of any forcible sexual assault crime (see *People v. Hughes* (2002) 27 Cal.4th 287, 336 [battery lesser included offense of forcible sodomy]; *In re Jose M.* (1994) 21 Cal.App.4th 1470, 1477 ["[e]very act of rape, of course, necessarily includes an assault"]), there was no evidence to warrant either

7

instruction in this case. The issue at trial regarding count 2 was whether Duran had sexually assaulted Ramona, as she claimed, or whether Ramona had fabricated the whole story, as Duran maintained, and the two did not have any physical contact in the car. In other words, if Ramona's testimony was credited, Duran was guilty of forcible oral copulation; if his was credited, there was no assault, sexual or otherwise. There was no substantial evidence upon which the jury could have reasonably absolved Duran of the greater crime of forcible oral copulation but not the lesser crimes of assault or battery. (See *People v. Medina* (2007) 41 Cal.4th 685, 700 ["trial court is not required to instruct the jury as to all lesser included offenses, only those that 'find substantial support in the evidence'"].)

### c. *There was no basis for a nonforcible-oral-copulation instruction*

Duran also contends the jury could have believed, regardless of his and Ramona's wholly divergent testimony, that they engaged in oral sex and Ramona consented. He argues, "[I]f the jury disregarded her testimony and believed it was a consensual act given they were boyfriend and girlfriend for seven years, Ramona's act [of performing oral sex on Duran] would still support the lesser included offense[] of . . . non-forcible oral copulation."

Duran's argument is nonsensical. He was charged with oral copulation by force or fear (§ 288a, subd. (c)(2)(A)).[6] Apart from the complete absence of any evidence from which a jury could reasonably infer consent—Ramona insisted the oral copulation was forced while Duran claimed it never occurred—there simply is no criminal offense of "consensual" or "nonforcible" oral copulation when the "victim" is at least 18 years old and thus legally capable of consenting. (Cf. § 288a, subd. (b)(1) ["[e]xcept as provided in [s]ection 288, any person who participates in an act of oral copulation with another

---

[6]     Section 288a, subdivision (c)(2)(A), provides: "Any person who commits an act of oral copulation when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished by imprisonment in the state prison for three, six, or eight years."

8

person who is under 18 years of age shall be punished by imprisonment in the state prison, or in a county jail for a period of not more than one year"]; (b)(2) ["[e]xcept as provided in [s]ection 288, any person over 21 years of age who participates in an act of oral copulation with another person who is under 16 years of age is guilty of a felony"].) Ramona was 46 years old, and Duran 31 years old, at the time of the attack. Instructions on either or both of the offenses in section 288a, subdivision (b)—rooted in the victim's inability to legally consent—were completely unwarranted here.

> d. *There was no substantial evidence to warrant instructions on felony or misdemeanor false imprisonment as lesser included offenses of kidnapping*

Duran was charged with simple kidnapping. (See § 207, subd. (a) ["[e]very person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping"].) Simple kidnapping essentially has three elements: "'(1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance.'" (*People v. Byrd* (2011) 194 Cal.App.4th 88, 101; *People v. Jones* (2003) 108 Cal.App.4th 455, 462.)

False imprisonment is the unlawful violation of the personal liberty of another. (§ 236; *People v. Fosselman* (1983) 33 Cal.3d 572, 579.) It occurs when the victim is ""'"compelled to remain where he does not wish to remain, or to go where he does not wish to go."'"" (*People v. Reed* (2000) 78 Cal.App.4th 274, 280; accord, *People v. Von Villas* (1992) 10 Cal.App.4th 201, 255.) The offense is a felony when it is effected by violence, menace, fraud or deceit. (§ 237; *Reed,* at p. 280.) Violence, in this context, means the exercise of physical force used to restrain "over and above the force reasonably necessary to effect" the restraint. (*People v. Matian* (1995) 35 Cal.App.4th 480, 484; accord, *Reed,* at p. 280.) Menace is a threat of harm express or implied by word or act. (*Matian,* at p. 484.) Both misdemeanor and felony false imprisonment by violence or menace are lesser included offenses of kidnapping. (*People v. Magana*

9

(1991) 230 Cal.App.3d 1117, 1120-1121; *Reed,* at p. 284.) The difference is that the greater offense of kidnapping has the additional asportation requirement. (*Reed,* at p. 284.)

Duran contends the court had a duty to instruct sua sponte on both misdemeanor and felony false imprisonment as lesser included offenses to kidnapping in count 1. He argues the jury could have believed that Ramona, detained in the car against her will, subsequently agreed to go willingly with Duran to avoid arguing with him at home in front of her son. Accordingly, he urges, there was evidence from which the jury could have absolved him of the greater offense of kidnapping—no asportation against her will—and convicted him of the lesser included offense of either felony or misdemeanor false imprisonment.[7]

Contrary to Duran's contention, there was no evidence from which the jury could have found the detention unlawful but the movement consensual. According to Duran's testimony, he and Ramona were in the house together when Ramona said, "Let's go to the store." They left together and drove to the gas station to pick up supplies. Under Duran's version of events, therefore, there was neither unlawful detention nor unlawful asportation and thus no kidnapping or false imprisonment. Ramona, in contrast, testified Duran had accosted her in her car, detained her against her will and immediately ordered her to drive away. Scared of him and his threatening behavior and wanting to protect herself and her teenage son from Duran's aggression, she complied. On that evidentiary record there was no basis for the jury to find Duran guilty of false imprisonment but not the greater crime of kidnapping. (See *People v. Kelly* (1990) 51 Cal.3d 931, 959 [lesser-included-offense instruction on false imprisonment is not required when the evidence

---

[7] The Attorney General's contention there was substantial evidence to support the kidnapping conviction is not responsive to Duran's argument. The question raised is not whether there was substantial evidence to support the verdict, but whether there was substantial evidence from which a reasonable fact finder could have found the defendant guilty of the lesser but not the greater offense. The two inquiries are quite different, with the latter subject to independent review by this court. (See *People v. Cole, supra,* 33 Cal.4th at p. 1218.)

10

establishes the defendant was either guilty of the greater kidnapping offense or not guilty at all].)

Duran also argues false imprisonment instructions were warranted because there was "no way Duran could have kidnapped Ramona without also falsely imprisoning her, either by violence or menace or without violence or menace." Indeed, that is the very definition of a lesser included offense—the greater offense cannot be committed without also committing the lesser. (§ 1159; *People v. Hughes*, *supra*, 27 Cal.4th at pp. 365-366 [a defense is lesser included "when the greater crime 'cannot be committed' without also committing another offense'"].) Nonetheless, instructions on the lesser included offense are appropriate only when there is evidence to support a finding of defendant's guilt on the lesser, but not the greater, offense. As explained, that was not possible in this case.

e. *There was no substantial evidence to support an instruction on attempt to make a criminal threat*

In order to prove the completed crime of making a criminal threat as defined in section 422, the prosecution must establish: "(1) that the defendant 'willfully threatened to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonable' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 228.) Recently, in *People v. Chandler* (2014) 60 Cal.4th 508, 525, the Court clarified the threat itself must be objectively threatening, that is, sufficient to cause a reasonable person to be in sustained fear.

11

The crime of attempted criminal threat is a lesser included offense of making a criminal threat. (*People v. Chandler, supra,* 60 Cal.4th at p. 515; *People v. Toledo, supra,* 26 Cal.4th at p. 230.) A defendant properly may be found guilty of attempted criminal threat whenever he or she intends to make a criminal threat "'but is thwarted from completing the crime by some fortuity or unanticipated event.' [Citation.] 'For example, if a defendant takes all steps necessary to perpetrate the completed criminal threat by means of a written threat, but the crime is not completed only because the written threat is intercepted before delivery to the threatened person, the defendant properly may be found guilty of attempted criminal threat. Similarly, if a defendant, with the requisite intent, orally makes a sufficient threat directly to the threatened person, but for some reason the threatened person does not understand the threat, an attempted criminal threat also would occur. Further, if a defendant, again acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat.'" (*Chandler,* at p. 515.)

Duran contends there was "a serious factual question" whether Ramona had heard Duran's threats, thus requiring the court to instruct sua sponte on the lesser included offense of attempted criminal threat. Contrary to Duran's characterization of the record, the factual question presented to the jury was not whether Ramona had heard the threat, but whether the threat was made at all. Ramona initially testified, consistently with her preliminary hearing testimony but inconsistently with her initial reports to police, that Duran did not threaten to kill her. She changed her testimony later on redirect examination—explaining the reason for her inconsistency—and insisted Duran did threaten her life while he was strangling her. Julian testified similarly. Duran, on the other hand, testified he never made the threat at all. The jury was left to decide whether

12

the threat was made, not whether Ramona had heard it if it had been. There was no evidence to support giving the attempted criminal threat instruction.[8]

### 2. *The Prosecutor Did Not Commit Misconduct*

Defense counsel told the jury during closing argument "Now it's incumbent upon you, as jurors, that you deliberate and consider each and every charge. Now, each charge is different. There are five different counts. You decide each count separately. Although you deliberate as a jury, as a whole jury, eventually each and every one of you will make your individual vote. After a thorough and full deliberation, the question will come to juror number 1: Has count 1 been proven to you beyond a reasonable doubt? Yes or no. And after a full and thorough deliberation, if juror number 1 agrees with juror number 2, great; if juror number 1 does not agree with juror number 2, then we have to accept that too. This is not a compromise vote. It's not, well 10 of us think so-and-so, the 10 wins. It's not, well, I'll give you count 2 if you give me count 3. No, it's not a compromise

---

[8]     Although not identified by Duran in his appellate brief as the basis for his argument, there was testimony by Avilá that Duran had threatened to kill Ramona while the two were outside in front of the house. This was the focus of the court's concern at the preliminary hearing, when Ramona denied Duran had threatened her inside the house and did not claim to have heard the outside threat. At the preliminary hearing the court held Duran to answer to the reduced attempt crime on the theory there was insufficient evidence Ramona had heard the outside threat and no evidence any other threat had been made. After Ramona testified at trial Duran had threatened her life during the attack inside the home, the information was amended to charge the completed crime of making a criminal threat.

Mindful of the confusion that could be caused by evidence of two separate threats, the prosecutor made clear during closing argument that the charge of making a criminal threat in count 4 was directed exclusively to the threat made to Ramona inside the home: "[J]ust so it's clear with everyone here, on the criminal threat charge, [Duran] should be convicted for [the] threat that occurs inside, during or immediately after the strangulation, the one that is heard by Julian and the one which Ramona finally admitted. Th[e] [other] one, there is no evidence that Ramona actually heard this threat, the one that occurs outside. . . . [T]he theory that I'm asking you to convict him on, so there is no ambiguity about this, is that he threatened her inside the residence, during or immediately after the strangulation, as heard by Ramona and her son, Julian." The prosecutor's clarification negated any reason for giving an attempted criminal threat instruction.

13

vote. Each juror decides each count for yourself. Has this case been proven to me beyond a reasonable doubt?"

During his closing argument in rebuttal, the prosecutor stated, "[Defense counsel] suggested he's not really up here looking for compromise, the defendant is not looking for compromise in this case. But, in a subtle way, they are. They're saying, 'Look, I'm admitting perhaps the least serious aspect of this case, that I put hands on her and scratched her. . . . There is a certain amount of appeal to that argument because, by nature, we're all compromising people, and so it's tempting to say, well, look, everybody in this case, even the defendant, agrees that a cohabitant beating happened. Well, okay. So go back in there, and on that verdict form, you fill out guilty. And then there are four other verdict forms for four other charges for four other crimes that ha[ve] [a] serious impact on Ramona T., and I believe the evidence has shown they happened. I'm asking you to do the work on the rest of them. Discuss those charges. Return the verdicts that you believe the evidence supports."

Duran, whose objection to the argument was overruled, contends the prosecutor's statements improperly and prejudicially maligned the credibility and integrity of defense counsel. (See *People v. Redd* (2010) 48 Cal.4th 691, 734 ["'[a] prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel'"]; *People v. Hill* (1998) 17 Cal.4th 800, 832 [same].) However, nothing in the prosecutor's comments can be reasonably understood as an attack on counsel's character. The comments properly focused the jury on the evidence and the individual charges and urged it to reach a verdict on all the charges presented. (*Redd*, at p. 735.) There was nothing deceptive, improper or denigrating about the prosecutor's remarks; they fell well within the wide latitude allowed in commenting on the deficiencies in defense counsel's arguments. (See *People v. Bemore* (2000) 22 Cal.4th 809, 846 ["the prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account"].) Accordingly, there was no misconduct under either the state or federal Constitutions. (See *People v. Samayoa* (1997) 15 Cal.4th 795, 841 ["'"A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises

14

a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'""""].)

3. *Duran Has Forfeited His Challenge to the Amount of the Restitution and Parole Revocation Fines*

At sentencing the court ordered Duran to pay a $280 restitution fine under section 1202.4, subdivision (b), and a $280 parole revocation fine under section 1202.45. Duran contends the amount of the fine was error because, at the time he committed the offenses charged in counts 1 and 2 (December 2011) the minimum restitution fine was $200; and at the time he committed the offenses charged in counts 3-5 (August 2012), the minimum fine was $240.[9] (See *People v. Souza* (2012) 54 Cal.4th 90, 143 [statutory minimum for restitution and parole revocation fines are determined by law in effect at time defendant committed offense; "imposition of fines constitutes punishment, and is therefore subject to proscriptions of the ex post fact clause and other constitutional provisions"].) Although he acknowledges the amount of the fine ordered is not unauthorized—at the time of the offenses the court had the discretion to impose fines up to $10,000—Duran speculates the court must have intended to impose the minimum restitution fine, but erroneously believed that minimum was $280. Duran, who did not object at sentencing,

---

[9] Section 1202.4, subdivision (b), requires the court to impose a restitution fine in every case in which a person is convicted of a crime "unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record." At the time of the offense, subdivision (b)(1) of section 1202.4 vested the court with the discretion to determine the amount of the fine, so long as the amount was not less than $200 or more than $10,000. (See Stats. 2011, ch. 45, § 1.) It has since been amended to increase the statutory minimum amount from $200 to $240 starting January 1, 2012; to $280, starting January 1, 2013; and to $300, starting January 1, 2014. (See Stats. 2012, ch. 873, § 1.5.) Section 1202.45 requires the court in every case in which a person is convicted of a crime and subject to the possibility of parole to also impose a parole revocation fine "in the same amount" as the restitution fine imposed under section 1202.4, subdivision (b).

requests we modify the sentence to reduce the fine to the statutory minimum authorized for crimes committed before January 1, 2012 ($200) or to the minimum amount for those offenses committed before January 1, 2013 ($240).

As Duran acknowledges, the amount of the restitution and parole revocation fines, so long as they are within the statutorily authorized boundaries, is a discretionary matter for the trial court. Unless unauthorized (see *People v. Scott* (1994) 9 Cal.4th 331, 354 [a sentence is unauthorized when "it could not lawfully be imposed under any circumstances in the particular case"]), a sentence must be objected to in the trial court to preserve the objection for appeal. (*Ibid.*) Here, the record is silent as to the court's intent in imposing the $280 restitution and parole revocation fines; and Duran, perhaps recognizing the court's discretion to impose the fines in far greater amounts, did not object to either fine. Duran's failure to object to the amount of the fine forfeits his challenge on appeal. (See *People v. Smith* (2001) 24 Cal.4th 849, 853 [when record shows parole revocation fine was different from restitution fine and neither amount was objected to below, defendant forfeited objection to amount of restitution fine; however, court could correct the amount of the parole revocation fine, which, imposed in an amount different than the restitution fine, was statutorily unauthorized under § 1202.45].)

## DISPOSITION

The judgment is affirmed.


PERLUSS, P. J.


We concur:


WOODS, J.                    SEGAL, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.